**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **CITY WIDE COMMUNTY** | § | **Case No. 21-30847-MVL-11** |
| **DEVELOPENT CORP.** | § | |
| *ET AL.* | § | |
| | § | |
| **DEBTORS** | § | **JOINTLY ADMINISTERED** |

## CONSOLIDATED DEBTORS' DISCLOSURE STATEMENT OF THE FIRST AMENDED PLAN

Dated: May 25, 2021

Respectfully submitted,

**WILEY LAW GROUP, PLLC**

/s/ Kevin S. Wiley, Sr.
Kevin S. Wiley, Sr.
State Bar No. 21470700
325 N. St. Paul Street, Suite 2250
Dallas, Texas 75201
Telephone: 972-913-2683
Telecopier: 972-449-5717
Email: kwiley@wileylawgroup.com
*Proposed Counsel for Debtors*

# TABLE OF CONTENTS

**1. Defined Terms and Rules of Interpretation**........................................................ **2**
a. Rules of Interpretation and Construction ............................................................ 2
b. Defined Terms.................................................................................................... 3

**2. Background and Executive Summary**............................................................... **10**
a. Summary of the Plan; Overview of the Debtors-CWCDC, LUVR and LUVC... 10
b. Recently Completed and Planned Projects:....................................................... 12
c. Other Pending Projects..................................................................................... 15
d. Illustrations of Completed Projects and Further Descriptions of Pending
   Projects ............................................................................................................ 18
e. Future Proposed Projects.................................................................................. 20
f. Summary All City-Wide CDC Projects and Assets .......................................... 21
g. Operations ....................................................................................................... 22
h. Programs ......................................................................................................... 22
i. Property Level Performance ............................................................................. 23
j. Partners ........................................................................................................... 23

**3. Events Leading to the Chapter 11 Filings**...................................................... **24**
a. CWCDC Requests  Relief from Terms of City Transactions-July-Oct. 2020 ..... 24
b. City of Dallas Response to Requests for Relief ................................................ 27

**4. Disclosures** ..................................................................................................... **33**
a. Legal Structure and Ownership........................................................................ 33
b. Current and Historical Conditions ................................................................... 34
c. Certain Federal Income Tax Consequences ...................................................... 35
d. Alternate  Plans and Disclosure Statements..................................................... 35
e. Best Interests Test ........................................................................................... 36
f. Liquidation Analysis ....................................................................................... 37
g. Feasibility........................................................................................................ 37
h. Acceptance by Impaired Classes—100% Payment on Terms Virtually Assures
   Acceptance ....................................................................................................... 38
g. Confirmation Without Acceptance by All Impaired Classes.............................. 38
h. Sources of Information Provided ...................................................................... 39
i. Accounting Methodology.................................................................................. 39
j. Condition and Performance of Debtor While in Chapter 11.............................. 39
k. Future Management of Debtor & Compensation of Management and Insiders .. 39
l. Details Regarding the Plan's Funding & Capital Needs ..................................... 40
m.     Assessment of the Collectability of Accounts Receivable ........................... 40
n. Relationship of Debtor with Affiliates.............................................................. 40
o. Avoidable Transfers & Causes of Action ......................................................... 41

**5. Risk Factors** ................................................................................................... **41**
a. Bankruptcy Law Considerations ...................................................................... 42

ix. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan ................................................................................................................... 45

b. The Reorganized Debtor May Not Be Able to Achieve their Projected Financial Results ............................................................................................................... 46

c. Risks Related to the Debtors and the Reorganized Debtors' Businesses ............. 46

**6. Summary of the Debtors' Assets and Treatment of Claims and Equity Interests .................................................................................................... 51**

a. Summary of Assets ............................................................................................ 51

b. Summary of the Plan of Reorganization .............................................................. 52

c. Administrative and Priority Claims ..................................................................... 52

d. Summary of Treatment of Claims and Equity Interests ........................................ 54

**8. Claims Objections ........................................................................................ 64**

**9. Confirmation Procedure ............................................................................... 64**

a. Hearing ............................................................................................................. 64

b. Procedure for Objecting ..................................................................................... 65

c. Requirements for Confirmation ........................................................................... 65

d. Classification of Claims and Equity Interests ...................................................... 66

e. Impaired Claims or Equity Interests .................................................................... 66

f. Eligibility to Vote on the Plan ............................................................................ 66

g. Voting Deadline ................................................................................................. 67

h. Acceptance of the Plan ...................................................................................... 67

**10. Provisions Governing Distributions .............................................................. 67**

a. Method of Payment ........................................................................................... 67

b. Distribution Agent ............................................................................................. 67

c. Distributions ..................................................................................................... 68

e. Rule for Disputed Claims ................................................................................... 69

f. Undeliverable Distributions and Unclaimed Property ........................................... 69

**11. Effect of Confirmation of the Plan ............................................................... 69**

**12. United States Trustee Fees ......................................................................... 70**

**13. Miscellaneous Provisions ............................................................................ 70**

a. Binding Effect ................................................................................................... 70

b. Headings ........................................................................................................... 71

c. Termination of Injunctions or Stays .................................................................... 71

d. Severability ....................................................................................................... 72

e. Revocation or Withdrawal of the Combined Plan and Disclosure Statement ........ 72

f. Exhibits and Schedules. ..................................................................................... 72

g. No Admissions .................................................................................................. 72

h. Successors and Assigns. ...................................................................................... 73

i. Implementation ................................................................................................... 73

j. Inconsistency ....................................................................................................... 73

## NOTICE AND DISCLAIMERS

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS, THE CONSOLIDATED DEBTORS' FIRST AMENDED PLAN AND FIRST AMENDED DISCLOSURE STATEMENT. THE FIRST AMENDED PLAN AND FIRST AMENDED DISCLOSURE STATEMENT WERE SUBSTANTIALLY COMPILED FROM THE DEBTORS' BOOKS AND RECORDS TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF. THE DELIVERY OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS FIRST AMENDED DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11 OF THE BANKRUPTCY CODE. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

NO REPRESENTATION CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS FIRST AMENDED DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS ARE NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN OR INCONSISTENT WITH INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN

STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS FIRST AMENDED DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS FIRST AMENDED DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE FIRST AMENDED PLAN AND FIRST AMENDED DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **CITY WIDE COMMUNTY** | § | **Case No. 21-30847-MVL-11** |
| **DEVELOPENT CORP.** | § | |
| *ET AL.* | § | |
| | § | |
| **DEBTORS** | § | **JOINTLY ADMINISTERED** |

**CONSOLIDATED DEBTORS' FIRST AMENDED  DISCLOSURE STATEMENT FOR THE FIRST AMENDED  PLAN**

On April 30, 2021, (the "Petition Date") City Wide Community Development Corporation, ("CWCDC") and its wholly owned subsidiaries, Lancaster Urban Village Residential, LLC, ("LUVR")and Lancaster Urban Village Commercial, LLC ("LUVC") ( collectively, the "Debtors") filed their respective  petition for relief under Chapter 11, Title 11.

On or shortly after that same date, CWCDC, LUVR, and LUVC filed motions for procedural consolidation, and other "same day pleadings" some of which are pending on the date of the filing of this Plan. Some of these motions were granted in various interim or final orders.  Interim relief  continued relief requested until June 1, 2021 and provided interim   relief on the motions for procedural consolidation [Dkt. #6]; cash management procedures [Dkt. #12]; and cash collateral [Dkt. #11]. Final orders were granted on combining mailing matrices.[Dkt. #14].

On  May 3, 2021, Debtors filed a Combined Plan and Disclosure Statement (the "Disclosure Statement") , [Dkt. # 4] which proposed a plan (the "Plan") for  substantive consolidation of all of the Debtors. The Debtors were the proponents of this Plan within the meaning of Section 1129 of the Bankruptcy Code. This disclosure is the First

1

Amended Disclosure Statement to the First Amended Plan (the "First Amended Disclosure Statement" and the "First Amended Plan) being field herewith made in satisfaction of the 11 U.S.C. §1125(f) requirements for adequate disclosure for reorganizations.  This First Amended Disclosure statement is provided to provide adequate disclosure required in determining consent of impaired classes qualified to vote with the required consent of at least one impaired class of creditors, if any, required under 11 U.S.C. §1129(a) (10 for confirmation of the First Amended Plan.

## 1. Defined Terms and Rules of Interpretation

### a.  Rules of Interpretation and Construction

For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and the neuter gender, (ii) any reference herein to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) any reference to any existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (iv) unless otherwise specified, all references to "sections" are references to or sections hereof in the Debtors' First Amended Plan; (v) the words "herein," "hereof" and "hereto" refer to the Debtors' First Amended Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to sections or subsections are inserted for convenience of reference only and are not intended to be part of or to affect the interpretation hereof; (vii) the rules

of construction set forth in section 102 of the Bankruptcy Code shall apply; and (viii) any term used in capitalized form herein that is not otherwise defined shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

The provisions of the Bankruptcy Rule 9006(a) shall apply in the computing any period of time prescribed or allowed hereby.

### b. Defined Terms

Unless the context otherwise requires, the following capitalized terms used in this Plan shall have the meanings set fourth bellow:

1. "*Administrative Expense Claim*" means a Claim for costs and expenses of administration of the estate, including: (a) the actual and necessary cost and expenses incurred after each Debtors' respective Petition Date and through the Effective Date of presenting the Estates and operating the business of the Debtors, (b) professional fee Claims, and (c) statutory see Claims.

2. "Affiliate" means, with respect to any Entity, "affiliate" as defined in section 101 (2) of the Bankruptcy Code.

3. "*Allowed*" means, with reference to any Claim (i) any Claim against the Debtor which has been listed by the Debtors in their respective Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed; (ii) any Claim or Equity Interest arising on or before the Effective Date for which a Proof of Claim has been timely filed before the applicable bar date (x) as to which no objection to allowance has been interposed or (y)

as to which any objection has been determined by a final order to the extent such objection is determined in favor of the respective Holder, (iii) any Claim or Equity Interest as to which the liability of the Debtor and the amount thereof are determined by a final order of a court of competent jurisdiction other than the Bankruptcy Court and for which a Proof of Claim has been timely Filed before the applicable bar date, or (iv) any Claim expressly Allowed hereunder or pursuant to an Order of the Bankruptcy Court; provided, however, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an Order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder. Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the First Amended Plan, include interest, punitive damages or any fine or penalty on such Administrative Expense Claim or Allowed Claim from and after the Petition Date. Unless otherwise provided in an Order of the Bankruptcy Court, for purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any claim which the Debtor may hold or assert against the Holder thereof, to the extent such claim may be set off pursuant to sections 502(d) or 553 of the Bankruptcy Code.

4. "*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation has been.

commenced as of the Effective Date to prosecute such Claims or Causes of Action.

5. "*Ballot*" means the ballot forms distributed with the First Amended Plan to Holders of Impaired Claims entitled to vote in connection with the solicitation of acceptances of the First Amended Plan.

6. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101- 1532.

7. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas having jurisdiction over these Chapter 11 Cases.

8. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure.

9. "*Books and Records*" means those books, records, and financial systems of the Debtor, including any and all documents and any and all computer generated, or computer-maintained books and records and computer data, as well as electronically generated or maintained books and records or data, along with books and records of the Debtor maintained by or in the possession of third parties, wherever located.

10. "*Business Day*" means any day, other than a Saturday, Sunday or a "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)).

11. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

12. "*Causes of Action*" means all actions, causes of action (including Avoidance Actions), liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, cross-claims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims whatsoever, in each case held by the Debtors, whether disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law,

equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date, or during the course of the Chapter 11 Cases through the Effective Date.

13. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case filed for the Debtor under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

14. "*Claim*" means any claim (as defined in section 101(5) of the Bankruptcy Code) against a respective Debtor.

15. "*Class*" means a category of Holders of Claims or Equity Interests pursuant to section 1122(a) of the Bankruptcy Code.

16. "*Confirmation*" means the entry of the Confirmation Order by the Bankruptcy Court on the Docket of the Chapter 11 Cases.

17. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the Docket of the Chapter 11 Cases.

18. "*Confirmation Hearing*" means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation Debtors' plan of reorganization in the First Amended Plan after hearing and approval as adequate of the First Amended Disclosure Statement, as such hearing may be adjourned or continued from time to time.

19. "*Confirmation Order*" means the Order of the Bankruptcy Court confirming the First Amended Plan pursuant to section 1129 of the Bankruptcy Code.

20. "*Creditor*" means any Entity that is the Holder of a Claim against either of the Debtors.

21. "*Debtors*" means all the individual Debtors, in its/their capacity as a debtor and debtor in possession.

22. Reserved.

23. "*Disputed*" means every Claim, or any portion thereof, that has not been Allowed pursuant to the First Amended Plan or a final order of the Bankruptcy Court and:

> i.       if a Proof of Claim has been timely filed by the applicable Bar Date, such Claim is designated on such Proof of Claim as unliquidated, contingent, or disputed, or in zero unknown amount, and has not been resolved by written agreement of the parties or a final order of the Bankruptcy Court.

> ii.       if either (1) a Proof of claim has been timely filed by the applicable bar date or (2) a Claim has been listed on the Schedules as other than unliquidated, contingent or disputed, or in zero or unknown amount, a Claim (i) as to which either Debtor has timely filed an objection or request for estimation in accordance with the First Amended Plan, the Bankruptcy Code, the Bankruptcy Rules, and orders of the Bankruptcy Court, in each case which objection, request for estimation or dispute has not been withdrawn, overruled or determined by a final order;

> iii.       that is the subject of an objection or request for estimation filed in the Bankruptcy Court and which such objection or request for estimation has not been withdrawn, resolved, or overruled by final order of the Bankruptcy Court; or

> iv.       That is otherwise disputed by the Debtors in accordance with the

provision of the First Amended Plan or applicable law, which dispute has not been withdrawn, resolved, or overruled by final order.

24. "*Distribution*" means any distribution to the Holders of Allowed Claims.

25. "*Effective Date*" means the first Business Day after the Confirmation Date. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

26. "*Entity*" has the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

26. "*Equity Interest*" means any issued, unissued, authorized, or outstanding shares of common stock, preferred stock, membership interest or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, and all rights arising with respect thereto that existed immediately before the Effective Date.

27. "*Estate*" means, as to each of the Debtors, the estate created for the individual Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

28. "*Executory Contract*" means a contract, as it may have been amended, restated, or otherwise modified and including any codicils, amendments, exhibits or annexes thereto, if any, to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

29. "*Governmental Unit*" has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

30. "*Holder*" means the beneficial holder of a Claim or Equity Interest.

31. "*Impaired*" means, with reference to any Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

32. "*Intercompany Claims*" means, collectively, any Claim held by Debtors against an affiliated Entity.

33. "*Person*" has the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

34. "*Petition Date*" means April 30, 2021, the date on which each of the Debtors filed the petition for relief commencing the Chapter 11 Cases.

35. "*Proof of Claim*" means a timely filed proof of Claim filed against the Debtors in the Chapter 11 Cases.

36. "*Reorganized Debtors*" means the substantively consolidated Debtors, or any successor or assign thereto, by merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, spinoff, or otherwise, on and after the Effective Date.

37. "*Retained Professional*" means an Entity employed in the Chapter 11 Cases in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred in the Chapter 11 Case; or for which compensation has been Allowed by an order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

38. Reserved.

39. "*Schedules*" means the Schedules of Assets and Liabilities and the Statement of Financial Affairs filed by each of the Debtors on the Petition Date, and any and all amendments and modifications thereto.

40. "*Statutory Fees*" means any and all fees payable to the United States Trustee pursuant to section 1930 of the United States Code for Debtors, and any interest thereupon.

41. "*United States Trustee*" means the United States Trustee for the Northern District of Texas.

## 2. Background and Executive Summary

### a. Summary of the Plan; Overview of the Debtors-CWCDC, LUVR and LUVC

#### Executive Summary

Debtors shall, as the Reorganized Debtor, continue to exist after the Effective Date as legal entities organized in the State of Texas without any prejudice to any right to alter or terminate such existence under applicable state law.

This Plan provides, with exception of the City of Dallas which is escrowed pending completion of resolution of disputes regarding whether there is a $1 million lien on LUVR, payment in full on the Effective Date, or under their respective terms. The priority claims to the taxing authorities, if any, will also be paid in full in five years. Unsecured creditors with claims of professional fees not requiring Court approval and trade accounts will be paid 100% of their claims in one single lump sum payment to be made within 180 days of the Effective Date.

#### Mission

CWCDC is a mission-driven, 501(c)(3) nonprofit organization that revitalizes neighborhoods in South Dallas (specifically along the Lancaster Corridor) by (i) developing mixed-income housing and mixed-use developments, and (ii) providing educational, literacy, employment-training and social programs that empower individuals and families to improve their quality of life.

Since its formation in 2001, CWCDC has raised over $67 million in operating and development capital and has successfully completed over 618 housing and

mixed-use development projects, encompassing over 29,746 sq. ft., in the Lancaster Corridor of South Dallas, including the award-winning Lancaster Urban Village development in 2014 and Serenity Place Apartments thru an affiliate in 2015. Through its development of these catalytic projects, CWCDC has been an innovator in addressing housing, retail, and office issues in South Dallas by developing mixed-use, transit-oriented "live/walk" communities centered around DART rail stations.

## History

CWCDC was founded in 2001 as Jarrell Community Development Corporation. The organization subsequently changed its name to Neighborhood Visions Community Development Corporation.

Wishing to expand the organization's mission to include housing for women, veterans, and the homeless, the board of directors hired Sherman Roberts in July 2006 as its new president and chief executive officer and became CWCDC. With a proven track record of providing affordable housing and social programs to families and individuals with low to very low income, Mr. Roberts has been instrumental in CWCDC's aforementioned raise in excess of $67 million in operating and development funds. During its nearly 15-year history of serving South Dallas, CWCDC has proven to be a vital part of the redevelopment of the Lancaster Corridor and the engine driving economic development in the area.

## Team

Sherman Roberts is the current President and CEO of CWCDC. He is assisted by a board of directors that includes seasoned real estate, community development, and

business executives. Mr. Roberts will continue in that capacity until confirmation of the Plan.

Following confirmation, Mr. Roberts will take a voluntary leave of absence to defend himself in a pending criminal proceeding alleging bribery founded on allegations of $5000.00 loans or gifts to an incarcerated felon, former City council person, Duane Carraway, and a deceased colleague. Mr. Roberts believes that Mr. Carraway, in turn, has smeared Mr. Roberts with this allegation in his futile attempt to reduce his sentence for accepting hundreds of thousands in bribes from other developers that are his convicted co-conspirators.

The Debtor believes that Mr. Roberts will be ultimately vindicated on these charges, which in the opinion of its Board of Directors are without merit. In the interim, and until after Confirmation, Mr. Roberts remains responsible for the day-to-day operations of the organization where one of his major duties is leading economic and housing development activities in the community. After taking his leave of absence following the confirmation of this Plan, Mr. Roberts will be succeeded by another seasoned community development executive chosen by the Board, with a candidate identified and agreeable to terms consistent with prior practice and conditions.

**b. Recently Completed and Planned Projects:**

### *Lancaster Urban Village*

While under Mr. Robert's guidance, CWCDC has developed multi-million dollar single and multi-family housing projects as well as office and retail properties. One such notable project, as aforementioned, includes Lancaster Urban Village ("LUV"). LUV is a 30-million-dollar completion cost, mixed-use, transit -oriented

development consisting of 193 apartment units, 14,000 square feet of office and retail space and 432 parking spaces. Development was completed in 2014.

The 193-unit residential portion of the development was financed as more fully described herein thru loans made to CWCDC's 100% owned Debtor affiliate, LUVR.  Likewise, the commercial portion of the development was financed thru CWCDC's 100% owned Debtor affiliate, LUVC.

The Debtor intends to market this property for its current appraised value, in an "as-is, where is" sale. Based on broker's opinion, this sale will be at a range of from $19 million to $22 million.  This sale, or refinancing in lieu of sale, if purchase fails, will drive funding of the Plan as described in greater detail herein.

### *Serenity Place Apartments; Oak Timbers Apartments and North Greenbriar Apartments*

CWCDC has also developed Serenity Place Apartments ("Serenity Place") thru another 100% owned, non-Debtor affiliate, City Wide Serenity Place Apartments, L.P., a Texas limited partnership. ("Serenity").  Serenity Place is a  45-unit gated community, offering permanent supportive housing for at-risk women with children.

A wholly owned corporation, City-Wide Serenity GP, Inc., ("GP") is the general partner of Serenity. owned 1% by GP, and 99% by Bank of America, N.A. ("BOA"). BOA has agreed to a first right of refusal to transfer Serenity Place back to GP after completion of debt repayment. This transfer will take place after the period expires for realization of all tax credits in 2045. CWCDC thus list its equity ownership of GP in its schedules and reflects the contingent  future value of Serenity Place as the basis for valuation of that equity. Since neither GP nor

Serenity LP are in default of any obligations, they are not consolidated debtors in this proceeding. The leases are likewise not executory contracts of CWCDC.

Oak Timbers and N. Greenbriar are very similar projects involving an 100% owned GP, that owns 1% of the LP, a LP that is owned 99% by the project banking partner, with a residual interest to the non-profit upon completion of recapture of tax benefits. In the case of Oak Timbers and in the case of N. Greenbriar, that date is also 2045.

### *Lancaster Kiest Crossing*

Serenity Place Apartments is immediately adjacent to the rear of Lancaster Kiest Crossing office building ("LKC"). LKC is another transit-oriented development that included in phase 1, the acquisition of the land underlying the old location, and relocation and new construction of Rudy's Chicken, a local community restaurant. In phases 2 and 3, City Wide CDC has also completed the aforesaid 9,986 square foot office building on the old Rudy's site, which is 90% leased, at a total cost in excess of $12 million dollars. Phase 3 also included the construction of Serenity Apartments.

Phase IV is to develop the lots that were left over after the acquisition and demolition of all four phases, and this land has been held by the City in constructive trust to assist CWCDC to avoid payment of property taxes pending development. City threatens termination of the conditional grant agreements that assisted in financing LKC, as described herein. The remedy sought by City is to recover any unimproved lots that still remain in phase IV whether owned by CWCDC or held in constructive trust. The Plan, as more fully described herein, seeks to modify this

agreement to recover the property held in constructive trust that City refuses to return to Debtor that interfered with the completion of phase IV, and cure the alleged defaults leading to the threat of acceleration.

### *Lancaster Opal Village*

Lancaster Opal Village ("LOV") is a planned transit-oriented development in close proximity on S. Lancaster Rd. to the other above projects completed. LOV would be the third transit-oriented development. Lancaster Opal Village is situated between the two-existing transit-oriented stations, VA Medical Station and Lancaster Kiest transit station. The project is immediately adjacent to the Lancaster Office Building, which is CWCDC's headquarters.

City of Dallas has also threatened to cancel grants for this Project, and recapture land that has been purchased subject to the lien of the conditional grants. This Plan will seek a renegotiation of this grant or pursue alternative financing with the working capital generated from sale of LUV.

**c. Other Pending Projects**

> **i. Other pending projects are further detailed herein for Lisbon and Kleberg.**

### *Market Area for the Projects*

For the past 10 years, CSCDC has had an intense and demonstrated focus on redeveloping the Lancaster Corridor area of South Dallas. The Lancaster Corridor is located approximately six miles south of Downtown Dallas and is highlighted by two major transit stops along the DART rail line and the $150 million Regional V.A. Hospital. In 2008, the City of Dallas designated this area as part of the Neighborhood Improvement Program, and it is also part of a strategic TIF district

intended to help spur much needed investment into the area. Additionally, the Lancaster Corridor is in a federally recognized opportunity zone and is eligible for many types of tax credit and other creative financing methods. The southern end of the Corridor is, as mentioned, home to the Dallas Regional V.A. Medical Center. The VA is one the largest employers in the region and is a major economic driver for the area .



CWCDC has thus chosen to focus its development efforts on the Lancaster Corridor because of the multi-modal transportation, the availability of land, buildings, and facilities, and the plethora of both public and private financing options targeted at the area. There are a number of aging, underutilized shopping centers, abandoned structures, and vacant lots throughout the area that could be transformed into active vibrant spaces. The added benefit of working in a TOD area means that developers can access financing programs that help to create viable investments in spite of lower rents or market forces typically associated with

areas of long-term disinvestment.

**Kiest Dart Station**



**VA Medical Center Dart Station**



VA Medical Center Dart Station

[BALANCE OF THIS PAGE LEFT INTENTIONALLY BLANK]



### d. Illustrations of Completed Projects and Further Descriptions of Pending Projects

#### *LUV*
*Lancaster Urban Village*



This trendy development located at <u>4417 S. Lancaster</u> Road, boasts 193 upscale apartments sitting above 14,000 square feet of office, retail, and restaurant space. The residential component is 100% leased by LUVR, and the commercial space is above 90 percent leased to date, by LUVC, and the LUV project has created 78 full-time employment opportunities. This $30 million dollar development costs served as the catalyst that created a strong urban streetscape and new commercial campus along the Lancaster Corridor . This project appraises at $22 million rounded based on detailed broker opinion, the agreed sales price to market the property is between $19-$20 million. The Debtor should receive at least $2.5 million in working capital for the Plan and other obligations after satisfaction of senior and junior lien creditors, and partnership claims of the limited partner under the partnership agreement described herein.

#### *LKC*

*Lancaster Kiest Crossing*



City Wide CDC completed the construction of Lancaster Kiest Crossing in 2017. This project is a two story 9,986 square feet office complex located at <u>3155 South</u> Lancaster Road. The complex is 90% leased with signed contracts with T-Mobile as the anchor tenant, Unique Style Barbershop, Designer Cake Daddy, Liberty Tax Office, Community Council of Greater Dallas, Elite News Media, and State Representative Toni Rose.

18

### *Serenity Place*



Serenity Place is a gated, 45-unit apartment complex as part of a long-term commitment to transition families out of city shelters and into productive, stable lives by providing high quality, permanent housing, and supportive services for homeless families with children. The development site is located adjacent to LKC on Lancaster Road, and is currently 100% occupied. CWCDC was awarded Section 8 project-based vouchers to assist the residents with rental subsidies.

### *Blossom Gardens*



Blossom gardens is a 12-unit, garden-style apartment complex dedicated to providing permanent housing. and supportive services to formerly homeless seniors. CWCDC provides comprehensive case management services and was awarded section 8 project-based vouchers to assist the tenants/clients with the rental subsidy.

The above four completed projects represent more than $37 million of investment activity into the corridor. The three proposed developments discussed below represent another $90 million in potential investments.

There is significant opportunity to create a much-needed connective fiber to the Veteran Administration Medical Center and generate meaningful growth in an area of Southern Dallas that the City has targeted for economic development. Future development should be welcoming and encourage pedestrian traffic and increased use of the DART line and further the objectives of the Dallas TOD TIF by creating more opportunities for transit-oriented development.

19

### e.  Future Proposed Projects

#### *Midtown at Lancaster South*

The Midtown at Lancaster South is a proposed mixed-use TOD directly across from the VA MedicalCenter. It boasts 120 units of affordable senior housing, 60,000 square feet of educational and officespaces leased to Cedar Valley Community College, and an additional 16,000 square feet of street facing retail. This project was submitted for grant approval by the City of Dallas but never received favorable response.

#### *Lancaster Opal*

A mixed-used development featuring 63 mixed income apartments, 21,000 squares feet of retail, and 10 for sale townhomes.



#### *The Village of Runyon Springs II*

Runyon Springs Phase II involved the acquisition ten (10) unimproved lots andthe construction of ten {10} single-family homes which all sold to families and/or individuals at or below 80% AMI.

Funding for this housing development project was provided by the City of Dallas, Texas Mezzanine Fund and Mutual of Omaha Bank. All these loans have been paid. Construction and the sale of the  homes were completed during the 4th quarter of 2017
*Total project cost $1,474,000.00.*





Project Details : 5720 sq. ft.   Suite 120 was also the former Workforce Office.

### f.  Summary All City-Wide CDC Projects and Assets

| Project | Date Completed | Type | Units | Retail SF | Cost |
|---|---|---|---|---|---|
| Lancaster Kiest Plaza | 2009 | Office | 4 | 5730 | $250,000 |
| Blossom Gardens | 2009 | Multifamily | 12 | | $950,000 |
| Village of Runyon Springs IREO | 2010 | Single Family | 13 | | $1,500,000 |
| REO Properties | 2012 | Single Family | 40 | | $1,200,000 |
| Oak Timbers | 2014 | Senior Housing | 168 | | $13,800.000 |
| North Greenbriar | 2014 | Multifamily | 128 | | $10,900.000 |
| Lancaster Urban Village | 2014 | Mixed-Use | 193 | 14,000 | $28,500,000 |
| Serenity Place Apartments | 2015 | Multifamily | 45 | | $7,081,000 |
| Village of Runyon Springs II | 2016 | Single Family | 10 | | $1,474,000 |
| Total | | | 618 | 23,986 | $67,638,000 |

Additional Undeveloped Land-Including Lisbon and Ann Arbor Projects

City Wide CDC has a strong development pipeline that includes 14 lots in the Lancaster Corridor and two additional lots in other prime areas of Dallas. The total development potential of these projects is more than $37,000,000.

| Development Pipeline | # of Lots | Acreage | Tax Value | Proposed Project | Construction Cost |
|---|---|---|---|---|---|
| .Lancaster Opal | 10 | 2.38 | $299,050 | 63 Apartments & Retail | $17,000,000 |
| Lisbon Village Estates | 4 | 3.8 | $145,410 | 23 For Sale Townhomes | $5,100,000 |
| Vacant Lancaster Lots | 2 | 0.75 | $60,000 | 1 Single Family Homes | $300,000 |
| **TOTAL** | **18** | **6.93** | **$504,460** | | **$22,400.000** |

### g. Operations

**Debt**

As will be described in more detail, CWCDC itself, not including other Debtors and non-Debtor affiliates, has a total of $791,000 in long term debt. Therefore, CWCDC will maintain a favorable debt position as long its properties continue to remain in compliance with the terms of their loans.

| | Owed | Forgivable | Total Payable |
|---|---|---|---|
| Lancaster Urban Village | {$1,000,0000) ? | | ($0) |
| Lancaster Kiest Crossing | ($791,000) | $0 | $791,000 |
| **TOTAL** | **($1,791,0000** | **$1,000,000** | **($791,000)** |

### h. Programs

In addition to its work in affordable housing, City Wide CDC also facilitates a workforce re-entry programto help ex-off ender to get job training, life skills, and housing. In the past two years , CWCDC has enrolled 88 participants into its Re-Entry program where they received training through a partnership with Cedar Valley College's Business Technology Division. CWCDC provides supportive services and case management for all of the participants in order to further help to remove barriers to their success. City has, however, terminated of this program effective December 27,2020. CWCDC has requested reconsideration with no response, and City still owes

$70,000 plus in billings which CWCDC will demand payment or initiate turnover proceedings to recover for the estate.

### i. Property Level Performance

Below is a summary of the performance of the income producing properties owned by City Wide CDC. (Lancaster Kiest Plaza is omitted to be added later)

| | Gross Rent | Gross Expenses | Net Income | Occupancy |
|---|---|---|---|---|
| Lancaster Kiest Crossing | $156,000 | ($62,400) | $93,600 | 90.00% |
| Lancaster Urban Village | $1,856,904 | ($1,349,004) | $507,900 | 80.00% |
| Serenity Place Apartments | $487,188 | ($310,419) | $176,73 | 91.11% |
| Blossom Gardens | $129,840 | ($42,000) | $87,840 | 100.00% |
| **TOTAL** | **$2,629,932** | **($1,763,856)** | **$866,076** | |

### j. Partners

CWCDC has fostered strong partnerships with a myriad of public and private organizations in order to successfully deliver on catalytic development projects. See below for a list of CWCDC partners.

#### Public Partners

City of Dallas Housing Department, City of Dallas Economic Development , US Department of HUD, Texas Department of Housing & Community Affairs , and Federal Home Loan Bank.

#### Banking Partners

Bank of America, Bank of Texas, BB&T, Capital One, Comerica Bank, Frost Bank, Legacy of Texas )P, Mutual of Omaha, Texas Mezzanine Fund, Wells Fargo, Regions, Bank and BBVA.

#### Development' & Management Partners

Catalyst Urban Development, Carlton Residential Construction, Dallas Home Connection, National Housing Advisors, and Capstone Management Company.

**3. Events Leading to the Chapter 11 Filings**

    **a. CWCDC Requests Relief from Terms of City Transactions-July-Oct. 2020**

        On July 7, 2020, CWCDC drafted a letter to the City of Dallas with respect to a request for relief under provisions of various City of Dallas ("City") transactional documents described in more detail herein. The letter outlined the following issues: CWCDC reminded the City that it had completed three phases of the four phases contemplated under the development plan of Lancaster-Kiest Crossing approved by the City. As aforementioned, phase 1 included the completion of the demolition and relocation of Rudy's Chicken; phases II-III include the development and construction of Serenity Place; phases II-III included the development and construction of the LKC office project on the old Rudy's site; and finally, phase IV included the completion of the mixed income development of the lots formerly acquired but transferred back to the City of Dallas in constructive trust to avoid tax expenses during the planning stages for the development of Phase IV of the Lancaster Kiest Village Development. The acquisition cost for all of these properties were funded from the same source of City of Dallas conditional grants as were funded for Phases 1-III. However, the demolition costs for Phase IV were completed in Phase III, and development funding for Phase IV was diverted to completion of construction of LKC in Phase III.

        CWCDC contends that, given the substantial completion of the projects in LKV by both parties, this transaction no longer remains an executory contract under the terms of the loan and assignment agreements as described herein. As a direct result, any alleged defaults thereunder, including alleged performance defaults of meeting development timetables, may be asserted as incurable since this is no longer an

executory contract. Rather, the default may be cured by tender of an alternative completion date in the plan and judged only by feasibility and other standard test for confirmation of a plan.

CWCDC therefore insists that any alleged "performance due" defaults are no longer required to be cured for any assumption of executory contracts, due to either the character of the transaction as a loan, and/or material performance of loan and assignment agreements by both parties renders the agreement non-executory. In any event, CWCDC also alleges that the City, shortly after CWCDC completing phase III of the development plan, and acting without any notice or prior explanation, refuses to tender back prime properties held for the phase IV of the LKC development project which include, but are not limited to, 3015 S. Lancaster Rd.; 3023 S. Lancaster Rd.; and 3025 S. Lancaster Rd.

CWCDC urged that given it had already completed phases I-III with over $12 million in investment and expended an additional $720,000 on the properties in phase IV in demolition, and other costs, that therefore the retention of these properties interrupted its ability to complete the development covenants on the timetable of the assignment and loan agreements. CWCDC therefore requested that City honor CWCDC's right to build Phase IV. City has refused this request. City's refusal has constituted an improper interruption, hindrance, and prevention of performance if indeed the contract for phase IV remains executory. This would excuse cure for purposes of assumption of the erstwhile incurable performance default.

Second, CWCDC requested City to also waive the separate $350,000 repayment lien due on any sale or refinancing that was part of the separate conditional

grant funding of Lancaster Office Building. CWCDC urges that this condition was discriminatory and arbitrary with respect to CWCDC since no such term is insisted for other non-profit developers for similar projects to its knowledge.

Third, CWCDC requested that the Reentry-Program be extended, and any defaults thereunder waived in lieu of the current halt to that program. Further, that the City reimburse CWCDC for the outstanding invoice in the amount of $70,000.00 plus dollars. In the interim, CWCDC has been forced to lay off staff ( 4 persons) and shut the program down.

Fourth, CWCDC requested that development timetables of the Lancaster Opal Development Project be extended. In this regard, CWCDC urged that the difficulties in the City relationship as evidenced by LKV resulted in similar intervention and hindrance defenses to alleged timetable performance defaults.

This letter was subsequently followed up by September 30, 2020 and October 13, 2020 letters that expanded and further reiterated the above-referenced requests that were in the earlier July 7, 2020 letter. The additional requests included the following:

-Cancellation of the $1 million promissory note and subsequent lien secured by the LUV properties, the consideration for which was the extension of the Sec. 108 loan, and bridge financing thru tax increment financing for the LUV project. This cancellation was based on the same argument as in Lancaster Office Building that the condition of this financing was discriminatory and arbitrary, and not imposed on similar non-profit developers for like-kind projects.

-Reiteration of the request for cancellation of the $350,000 payment

required on sale or refinancing of the Lancaster Office Building project.

-Waiver of any alleged defaults under the Homeless and Special Needs program.

-Reiteration of waiver of any alleged defaults under the workforce program.

**b. City of Dallas Response to Requests for Relief**

On December 18, 2020, the City of Dallas responded to these requests for relief as follows.

*LUV*

City asserts that the obligation for repayment of the $1 million note that assisted to finance this project, secured by all properties contained in LUV, that was extended without additional consideration therefor within applicable statutes of limitation, would not be waived and the City would insist on strict legal performance. This performance includes use restrictions that maintain the project at 50% affordable housing—a condition that , any prospective purchasers of the project would require be waived as a condition to paying appraised valuation of the property. City retains the ability to waive this condition, which Debtor understands is typically given.

In this regard, it is not the economics of the affordable rents—that is only a matter of a difference of no more than $.10 cents per sq.ft. Rather affordability, which restricts units to qualified tenants (low income but gainfully employed, with no prior criminal conviction) within 80% of mean average income, artificially reduces the availability of the tenant pool eligible to qualify for the affordable rent. These tenants are difficult to source in a hotly competitive market for qualified tenants, leading to volatility in the vacancy rates, whereas market units remain consistently 100% leased.

The use restrictions specifically allow for the release of this condition on the <u>later</u> to occur of 15 years from the 2012 date, or 2027, or, when the loan is repaid. (Emphasis added). There appear to be appropriate proceeds from sale of the LUV project as discussed herein that will satisfy the remaining balance of $1 million  loan requirement that if not waived, or otherwise avoided .  The Plan proposes that the City waive the use restriction upon payment of whatever obligation is owed.

In this regard, Debtor proposes in its plan that proceeds from the sale would be escrowed in an interest bearing account in the registry of this Court; that the  use restrictions waived by consent as a term of the confirmation order; and the dispute as to right to payment   resolved  if there is a valid legal challenge by the Debtor to the obligation either because (i)  less than full payment is required under the expressed terms; or (ii) the obligation is otherwise avoidable.

### *Lancaster Office Building*

City agreed that it had granted CWCDC a conditional grant of  a forgivable loan for $1,175,000 to construct its current office building.  City refused the CWCDC above-mentioned request to waive the $350,000 right to proceeds from sale or refinancing under the Conditional Grant Agreement on this project  that is now owned free and clear of any other liens.

In response to this position of the City, CWCDC intends to assume the conditional grant agreement, which would maintain this right with the City to insist on payment on sale or  refinance, since an assumption rather than rejection assumes all obligations under the agreement.  The benefit that CWCDC obtains is the forgiveness of the balance.

City also raised  the issue of default under the conditional grant agreement by the allowance of a senior lien to pay property taxes without consent of the City.  In response, The Plan will, , again, assume the executory contract and cure this default by retiring this senior lien using proceeds from  the sale of LUV as described in detail herein.

### *Lancaster Opal Project*

This project includes the 10 lots mentioned above in the development pipeline, immediately adjacent to the Lancaster Office Building.

CWCDC agrees with the City's letter of December 18, 2020 that on September 10, 2008, City granted CWCDC a $500,000, 0% interest loan for the acquisition of fourteen (14) properties (improved and unimproved) to be redeveloped for the purposes of residential or commercial use.  The loan was ultimately increased to $1,331,326 after several amendments, which also changed the loan to a conditional grant. The project was required to be completed by September 12, 2018.  CWCDC requested an extension, citing to acts of the City that had hindered and delayed the completion of the project. City refuses to grant the waiver. Debtor will seek, given its substantial record of completion of other projects, and the hindrance, delay and prevention defenses asserted, to assume this contract. If the City challenges the assumption on inability to cure the performance date default under 11 U.S.C. 365 and other applicable Bankruptcy Codes and rules, CWCDC will file suit for declaratory and injunctive relief based on the discrimination,  interference, hindrance, and prevention defenses it cites from other City conduct on other project  that it believes provide a separate remedy to permit assumption and cure of the timetable performance defaults. The Plan will await the outcome of the resolution of this dispute by settlement, litigation, or otherwise.

### *LKC*

City in its December 18, 2020 response correctly recited the details of the transactions with CWCDC on this Lancaster Kiest Crossing project. On December 12, 2012 city executed an Assignment of Purchase and Sale and Option to Develop Agreement (the "LKC Assignment") for properties in this project. CWCDC under its terms had three (3) years to complete the development of the four phases above-mentioned on the 14 properties that would be acquired.

In connection with the LKC Assignment, the City alleges that it provided a forgivable economic development loan for $450,000 at 0% interest maturing December 2015 for acquisition of improved and unimproved property.

The City alleges that it followed up the Phase 1 economic development loan with $3.4 million in general obligation bonds to support development.

On April 24, 2013, City increased the $450,000 economic development loan to a forgivable $600,000 to facilitate continued acquisition of improved/unimproved property. As of the date of that amendment, CWCDC had already expended $403,008 of the original $450,000.

The forgivable loan was further increased from $600,000 to $734,500 on June 16, 2013. According to the City in the December 18, 2020 letter, which CWCDC does not dispute, on that June 16, 2013 date, CWCDC had used loan funds to purchase 15 of the 16 properties identified for the project and expended $595,813 of the loan proceeds for that exclusive purpose. The loan terms did not change, and the maturity date remained December 2015, but was again amended on August 28, 2013 to increase the amount of the forgivable loan to $978,174.

According again to the City's December 18, 2020 letter "finally" on May 14, 2014, the City increased the economic development loan to a total amount of $1,576,374 to allow the purchase of the former Rudy's Chicken site at  3115 S. Lancaster Rd.

City then critically admits in the December 18, 2020 letter that "City Wide has completed Phases 2 and 3 of the Lancaster Kiest Redevelopment Project by completing construction of the new Rudy's Chicken operations (Phase 2) and Serenity Place Apartments (Phase 3)".

City thus ignores that Phases 1, 2 and 3 was much more than completion of new Rudy's Chicken, but also the development of the LKC office structure at a development cost in excess of $12 million. This deliberate understatement is a transparent attempt in CWCDC's opinion to avoid the substantial completion test governing executory contracts. This understatement is then compounded by the disputed  allegation in the letter that Phases 1 and 4 remain incomplete. This is untrue. Phase 1 merely involved the acquisition and construction of the former Rudy's Chicken at 3115 S. Lancaster, and the  demolition of the old site, to be later replaced by the LKC office building at that address. This has been done. What remains is only the expanded LKC project in Phase IV on the same side of the old Lancaster Kiest Library and lots adjacent.

City has advised that the failure to complete development under the Assignment constitutes a default under Par. 5 (sic. "V") of the Loan Agreement (the "LKC Loan Agreement") of roughly even date therewith.

CWCDC concedes that Phase 4, the development of the adjacent lots that represented acquisition and demolition of medical office buildings, has not been completed by the timetable of the LKC Assignment, and this is a technical default under

the LKC Loan Agreement. However, CWCDC reiterates that the development has been impeded by the City's refusal to cede control of these properties that were voluntarily conveyed for no consideration for the City to hold in trust, that precluded completion of the development on that timetable. CWCDC will, as aforestated, negotiate for the return of these properties, and if these negotiations fail, initiate either contested turnover or adversary proceedings for the return of the properties so that it may proceed with its development plans under the terms of the LKC Assignment and Loan Agreement as modified under the Plan to cure any alleged defaults.

CWCDC is not in monetary default with the third-party bank's financing that contributed to the LKC development from Legacy Bank, N.A. ("Legacy") (now "Prosperity Bank") as further described herein, and the Plan will not seek to modify its terms. Legacy is thus unimpaired. City is fully subordinated to Legacy under the express terms of a subordination agreement. Therefore, any remedy it asserts against CWCDC would also be subject to the terms of that subordination. The Plan would seek to cure any technical default with Legacy by the City's assertion of default, and/or the placing of debt senior to Legacy for property taxes, which will be paid from the proceeds of sale of LUV described herein.

### Lisbon Villages Estates Project

CWCDC has heretofore identified proposed projects for Lisbon Villages Estates Projects. The City has advised that it will rescind its commitment to these projects. CWCDC will evaluate its remedies for such attempted rescission, including, but not limited to reliance damages arising under promissory estoppel and other doctrines, if permitted under applicable sovereign immunity defenses.

32

CWCDC also remains open until Confirmation to negotiations after cure of other alleged defaults, to reinstate these projects. Otherwise, CWCDC will pursue other developmental options, including resubmission to the City if legal and/or negotiation efforts fails with improved offerings with greater equity contribution from CWCDC from the sale and/or refinancing of its successful projects described herein.

### *City's Announced Next Steps*

City advised CWCDC that in every instance of an alleged default, City intended to pursue all available legal remedies, including where applicable acceleration and foreclosure under various deeds of trust. This statement and threat thus precipitated this filing for relief to protect the substantial equities in the projects at issue. Also, such acceleration would constitute potential defaults with other lenders to the Debtors, which would need cure to prevent further domino effects of the City's actions.

**4. Disclosures**

   **a. Legal Structure and Ownership**

CWCDC, LUVR, and LUVC are all formed under the laws of the State of Texas, with the capital structure aforementioned where CWCDC is a non-profit that has no shareholders, and in turn, owns 100% membership of LUVR and LUVC. In addition, CWCDC is a general partner of a limited partnership, Lancaster Development Partners, LP. ("Development Partners") This partnership was created apparently primarily to compensate the operational assistance of the limited partner, Catalyst Urban Development, LLC, ("Catalyst") which assisted with the arrangement of financing and the operational backroom for the LUV project. Under the terms of the partnership agreement, CWCDC was to cause its wholly owned affiliates to convey, along with the

retained interest of CWCDC in LUV outside of these affiliates, the 100% fee interest in the LUV project to Development Partners. Then, upon any sale or refinancing, excess proceeds above deed service were to be paid to CWCDC as 1% general partner, and 69% limited partner, and the 30% balance to Development Partners. This 30% distribution to Development Partners was acknowledged by City of Dallas, together with the senior lien on the HUD 221(d)(4) financing of LUVR residential units, under loan agreements to be a priority to any payment to City under the Sec. 108 loan, including the $1 million "user" fee charged to CWCD for the combination Sec. 108 financing and new market tax credits.

Since no conveyance was ever made, Catalyst alleges that is the holder on unsecured partnership obligation for $2.5 million executed by CWCDC as GP of Development Partners. CWCDC counsel has requested any further note or other documentation but to date has yet to receive any further proof of this transaction, and therefore cannot determine the validity of the debt, except to concede if any note were executed by it separately, or as GP of Development Partners, that would constitute a liability of CWCDC. Thus, in the interim awaiting documentation, the loan is scheduled as an unsecured obligation of CWCDC that is disputed, contingent, and unliquidated.

### b. Current and Historical Conditions

DEBTORS' historical and projected financial performance is attached as **Exhibits A, B**, and **C. Exhibit A** reflects Debtor historic financial condition. **Exhibit B** reflects operational results for the period January -February 2021. **Exhibit C** reflects the Debtor projected financial condition for the next three years if requested since 100% plan makes this moot. **Exhibit D** reflects DEBTORS' operational results post filing. **Exhibit C and D** are reserved since the disclosure is being filed shortly

after the Petition Date and no operations have commenced post-confirmation on that date. **Exhibit E** reflects a hypothetical liquidation analysis if requested since this is an 100% plan that renders that analysis moot.

### c.   Certain Federal Income Tax Consequences

The confirmation and execution of this Plan may have tax consequences to Holders of Claims and Equity Interests. Debtor do not offer an opinion as to any federal, state, local or other tax consequences to holders of claims and equity interests as a result of the confirmation of this Plan. All holders of claims and equity interests are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of this Plan. This Plan is not intended, and should not be construed, as legal or tax advice to any creditor, equity interest holder or other party in interest. However, it is clear from existing tax rules that cancellation of any claim, right, or interest, including, but not limited to, cancellation of contingent, disputed, and unliquidated claims of the minority shareholders, and/or cancellation of the debt owed by the Estate to the Debtor, both in response to and in exchange for  treatment under the Plan, result in no ordinary income event to the holder of the debt under 11 U.S.C. §1146 et al. This tax result is a major incentive to the plan process in lieu of other options.

### d.   Alternate  Plans and Disclosure Statements

If this First Amended Plan is not confirmed, the Debtor, or any other party in interest under  Title 11, Chapter 11, could attempt to formulate a different plan. The Debtor believes that conversion of these Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code would result in the incurrence of significant additional fees and expenses to the detriment of the Creditors. If Debtor continues to operate, they will have

revenue to make payments to creditors in addition to the fixed payments made on the Effective Date Accordingly, the Debtor believes that the Plan enables creditors to realize the best return under the circumstances.

### e. Best Interests Test

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Equity Interest either (a) accept the plan or (b) receive or retain under the plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. The Plan proposes an 100% payment to Allowed Claims, thus mooting this test.

Because of the increased expenses that would be incurred in the event of a conversion of the Chapter 11 Cases to cases under Chapter 7, the value of any Distribution to Holders of Claims or Equity Interests if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be also approximate to the value of Distributions under this First Amended Plan., This is because conversion of the Chapter 11 Cases to chapter 7 cases would require the appointment of a chapter 7 trustee, and in turn, such chapter 7 trustee's likely retention of new professionals. This would add additional costs to the Estates and delay compared to the time of Distributions under this First Amended Plan.

Debtor believes that the Estates would have approximately the same funds available for distribution in a hypothetical chapter 7 liquidation than they would if this Plan is confirmed, and therefore Holders of Allowed Claims will recover no more in the hypothetical chapter 7 cases. Accordingly, Debtor believes that the "best interest" test of Bankruptcy Code Section 1129 is satisfied.

### f. Liquidation Analysis

As mentioned, the first Amended Plan will allow holders of Allowed Claims and Equity Interests approximately what would be available to them in a chapter 7 liquidation. A hypothetical chapter 7 liquidation analysis is attached to this Plan as **Exhibit E, but only if requested.** As would be seen in any liquidation analysis , the value of any Distributions if the Debtor' Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be approximately the same value of the Distributions under this Plan at 100% . Accordingly, the Debtor again believes that the "best interests" test of the Bankruptcy Code section under either 1129 is satisfied for all Debtors.

### g. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that Confirmation of the First Amended Plan be not likely followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successors to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the First Amended Plan.

Therefore, to determine whether the First Amended Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the First Amended Plan. As part of the analysis, the Debtors have prepared and attached as **Exhibits A, B,** hereto, the historic, and current financials.

Based on these financials, and proceeds from sale of LUV, the Debtors believe that they will be viable operations following the Chapter 11 Cases, and the Company has sufficient working capital because we are materially relying on payment from the promised sale or refinancing of LUV. The closing of the sale or refinancing of the First Amended Plan, or strong prospect therefore if not closed before Confirmation, will meet

the feasibility requirements of the Bankruptcy Code.

### h. Acceptance by Impaired Classes—100% Payment on Terms Virtually Assures Acceptance

The bankruptcy code requires, as a condition of confirmation that each class of claims of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defined acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a class of claims would have voted to accept the Plan only if two-thirds in amount of the allowed interests in such class that vote on the Plan actually cast their ballots in favor of acceptance. This test being met is assured by the proposal of 100% payment to all Allowed Claims on terms for unsecured creditors within 180 days from the Effective Date, unless otherwise extended in payment date but not amount.

If a class contains claims eligible to vote and no Holders of Claims eligible to vote in such Class voted to accept or reject the Plan, the Holders of such Claims in such Class were deemed to have rejected the Plan.

### g. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, provided that the plan has been accepted by at least one impaired class without consideration of votes of insiders. Thus, pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection

or deemed rejection of the plan, the First Amended Plan would be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan did not "discriminate unfairly" on the creation and treatment of classes, and was "fair and equitable" with respect to each class of claims or equity interests that are impaired under it, and have not accepted as those terms were defined under that statute.

### h. Sources of Information Provided

In preparing this First Amended Disclosure Statement, and the First Amended Plan, Debtors reviewed and relied on information contained in its/their Books and Records, and projections and customer feedback regarding future revenue. Assumptions made include the market value of fixed assets; the most recent broker appraisals of LUV project owned by the CWCDC Estate, adjusted for current events including the Covid-19 Pandemic, and the most recent financial results from operation; and the proposed sale of the LUV project that provides substantial equity to CWCDC, LUC, and LUR under the stalking horse Purchase Agreement attached hereto as **Exhibit** "F".

### i. Accounting Methodology

The Debtor accounting methodology used in preparing their projected financial information is cost accounting. Straight-line depreciation is used for the depreciation of assets. Historical financials are on accrual basis.

### j. Condition and Performance of Debtor While in Chapter 11

Since the plan was filed contemporaneous with the petition, this evidence and disclosure is reserved for the Confirmation hearing.

### k. Future Management of Debtor & Compensation of Management and Insiders

The Debtor' management will continue to be led by Sherman Roberts until

confirmation. Thereafter, he intends to voluntarily take a leave of absence to fight charges of bribery in connection with real estate development of the projects mentioned herein, excluding the LUV project that has not been mentioned to date in connection with any of these charges, which he and the Board of CWCDC believe are wholly unfounded. For example, the indictment mentions payment of the tab at routine business lunches as "bribes". None of these charges amount to over $5000 over several years. A new interim manager to take his stead after confirmation pending his leave will be announced during the confirmation proceedings.

### l.   Details Regarding the Plan's Funding & Capital Needs

Debtor does not intend to sell any additional capital assets, other than the LUV project, to fund the First Amended Plan. This sale or refinance will produce adequate revenues to fund an 100% plan and provide substantial working capital.  The First Amended Plan otherwise will be funded from existing cash and continued and increased operations.

Debtor projected capital needs as well as how the Debtor anticipate meeting the needs is reflected in **Exhibit C and D**. Debtor believe with the approval of this First Amended Plan, Debtor will be able to meet their capital needs and fund obligations to make payments under the Plan.

### m.  Assessment of the Collectability of Accounts Receivable

 Not applicable.

### n.   Relationship of Debtor with Affiliates

Debtor CWCDC is a Texas Non-Profit that has no shareholders. It is governed instead under its bylaws by an independent board of directors with no stockholder interest in CWCDC.  CWCDC, in turn, owns and controls its 100% owned affiliates, LUC and LUR

that were created to provide proper conduits for new market tax credits and HUD 221(d4) loans that required separation of the commercial businesses form the residential businesses. That was the sole reason for their separate existence. Under the Plan, these loans will either be assumed by the purchaser, or taken out by refinancing, and their respective creditors (other than the City of Dallas which may be escrowed for allowance of the City of Dallas claim which is disputed) paid 100%. These two entities under the First Amended Plan will then be dissolved. Likewise, after sale or refinancing, and satisfaction of any obligation owed to Catalyst, the Development Partners partnership will be dissolved. New CWCDC will remain as the sole reorganized debtor under the substantively consolidated First Amended Plan.

### o. Avoidable Transfers & Causes of Action

In Debtor' preliminary investigation is that it will investigate possible avoidable transfers to the City of Dallas for its "user fee" of the $1 million note: and the $350,000 penalty for sale or refinancing of the Lancaster Office Building In addition, a potential fraudulent transfer consists of the retention of lots in Phase 4 of LKC that were transferred under constructive trust. Same investigation will be concluded by either settlement, or filing of lawsuits to set aside these transactions, with proceeds from either sale or refinancing erstwhile held in interest bearing accounts in the registry of the Court pending a final, non-appealable order.

### 5. Risk Factors

Holders of Claims and Equity Interests should read and carefully consider the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only

risks present in connection with the Debtor' businesses or the First Amended Plan and its implementation.

### a. Bankruptcy Law Considerations

#### i. Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interest in the class. The Debtor believe that the classification of the Claims and Equity Interests under the First Amended Plan complies with this requirement because the Debtor created Classes of Claims and Interests each encompassing Claims or Equity Interests, or hybrids of same, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### ii. Voting Requirements

As aforementioned, voting requirements, it is inconceivable a plan will not be confirmed due to failure to meet voting requirements for those debtors, for reasons stated of the 100% Plan.

#### iii. Modification

The Bankruptcy Court could still decline to confirm the First Amended Plan if it finds that any of the statutory requirements for Confirmation n are not met. If a chapter 11 plan or reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtor will be able to reorganize their business and what, if anything, Holders of Allowed Claims or Equity Interests against them would ultimately receive with respect to their

claims or interests.

Thus, the Debtor, subject to the terms and conditions of the First Amended Plan, reserves the right to modify the terms and conditions of the First Amended Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any accepting or non-accepting Class of Claims or Interests, as well as any Class junior to such accepting or non-accepting Class, than the treatment currently provided in the First Amended Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the First Amended Plan or no distribution whatsoever under the First Amended Plan. Changes to the First Amended Plan may also delay the confirmation of the First Amended Plan and the emergence from bankruptcy.

### iv. Nonconsensual Confirmation

As aforementioned, in the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan the bankruptcy court determines that the plan if fair and equitable and t "does not discriminate unfairly" with respect to the dissenting impaired class(es). The Debtor believes that the First Amended Plan satisfies these requirements, and the Debtor may request such nonconsensual Confirmation in accordance with Section 1129 . Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the First Amended Plan may result in, among other things, increased expenses relating to professional compensation.

### v. Continued Risk After Confirmation

Even if the First Amended Plan is consummated, the Debtor will continue to face a

number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry and potential revaluing of their assets sue to the chapter 11 proceedings. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period with no indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the First Amended Plan will achieve the stated goals.

### vi. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If a bankruptcy court finds that it would be in the in the best interest of the creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed to liquidate the debtor' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) the possibility of additional expenses and Claims.

### vii. Debtor May Object to the Amount or Classification of a Claim

Except as otherwise provided in the First Amended Plan, the Debtor reserves the right to object to the amount or classification of any Claim filed under the First Amended Plan. The estimates set forth in the First Amended Disclosure Statement provided herein cannot be relied on by and Holder of a Claim where such Claim is subject to an objection. Any

44

Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this disclosure.

### viii. Risks of Non-Occurrence of the Effective Date

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will occur since the Effective Date depends on no third parties filing an appeal of the Confirmation Order. Debtor does not believe there is a likelihood of such an appeal, or if the Confirmation Order is appealed, that the result would be reversal of the Confirmation Order.

### ix. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the First Amended Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which would affect distributions available to Holders of Allowed Claims under the First Amended Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the First Amended Plan or require any sort of revote by Impaired Classes.

The estimated Claims and creditor recoveries set forth in this disclosure are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of claims may vary from the estimated Claims contained in this disclosure. Moreover, the Debtor cannot determine with any certainty at this time, the number or number of Claims that will ultimately be Allowed.

Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### b. The Reorganized Debtor May Not Be Able to Achieve their Projected Financial Results

The Reorganized Debtor may not be able to achieve their projected financial results. The financial projections set forth in this disclosure represent the DEBTORS' best estimate of DEBTORS' future financial performance, which is necessarily based on certain assumptions regarding anticipated future performance of the Reorganized DEBTORS' operations, as well as the domestic and world economies in general, and the industry segments in which the Debtor operates in particular. A substantial part of the risk of continued operations is negated by the Debtor providing lump sum estimated payments of actual results. Thus, if actual results are poorer, than all the risk is on the Debtor. The tradeoff for this certainly is the creditor does not benefit if operations are materially greater than projected results.

### c. Risks Related to the Debtors and the Reorganized Debtors' Businesses

#### i. The Reorganized Debtor May Not Be Able to Generate Sufficient Cash to Fund their Operations and Service their Indebtedness.

This risk as above analyzed is negated by a lump sum payment from the very likely proceeds of sale or refinancing the LUV project, owing to the substantial equity in the project held by the Debtors.

#### ii. The Reorganized Debtor Will Be Subject to Various Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' operations, including their ability to execute their business plan will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following:

- the Debtors' creditors or other third parties may take actions or make decisions that are inconsistent with and detrimental to the plans the Debtors believe to be in their best interests.

- Debtors may be unable to obtain court approval with respect to certain matters in the Chapter 11 Cases from time to time.

- the Bankruptcy Court may not agree with the Debtors' objections to positions taken by other parties.

- the Debtors may not be able to confirm and consummate the Plan or may be delayed in doing so.

- the Debtors may not be able to obtain and maintain normal credit terms with vendors, strategic partners, and service providers.

- the Debtors may not be able to continue to invest in its products and services, which would hurt their competitiveness.

- the Debtors may not be able to enter into or maintain contracts that are critical to its operations at competitive rates and terms, if at all.

- the Debtors may be exposed to risks associated with third parties seeking and obtaining court approval to (i) terminate or shorten the Debtors' exclusivity period to propose and confirm the Plan, (ii) appoint a Chapter 11 trustee or (iii)convert the Chapter 11 Cases to chapter 7 liquidation cases: and

- the Debtors' customers may choose to do business with its competitors.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events associated with the Chapter 11 Cases could affect the Debtor' ability to compete for new business and possibly affect the relationships

with business partners, vendors, and employees. Because of the risks and uncertainties associated with the Chapter 11 Cases, the ultimate impact of events that occur during these proceedings will have on the Debtor' business, financial condition, and results of operation cannot be accurately predicted or quantified.

### iii. Operating in Bankruptcy for a Long Period of Time May Harm the Debtor' Business

The Debtors' future results will be dependent upon the timely and successful confirmation and implementation of a plan of reorganization. If a restructuring is protracted, it could adversely affect the Debtors' operating results, including their relationships with advertising customers, business partners, and employees. The longer the Chapter 11 Cases continue, the more likely it is that the Debtors' financiers and strategic partners will lose confidence in the Debtors' ability to reorganize their business successfully and seek to establish alternative commercial relationships. If the Debtors experiences a protracted reorganization, there is a significant risk that the value of the enterprise would substantially be eroded to the detriment of all parties in interest.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will also be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

### iv. Financial Results May Be Volatile and May Not be Indicative of Future Financial Performance

During these Chapter 11 Cases, the Debtors' financial results may be volatile as restructuring activities and expenses may significantly impact the Debtors' financial statements. As a result, the Debtors' historical financial performance may not be indicative of its financial performance after the Petition Date.

### v. Debtors Have Liquidity Needs

The Debtors' ability to fund their operations and capital expenditures requires a significant amount of cash. Debtors' principal sources of liquidity historically have been cash flow from operations, and prospectively, the retained cash from the sale of the office building. If the Debtors' retention of this cash is interrupted by events in this case, or cash flow from operations decreases as a result of market conditions, demand for their units, or otherwise, the Debtor may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenue over time.

The Debtors thus face uncertainty regarding the adequacy of their liquidity and capital resources and during the pendency of these chapter 11 cases, may have limited access to additional financing. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connections with preparing for these chapter 11 cases and expect to continue to incur significant professional fees and costs throughout. Debtors cannot guarantee that uninterrupted cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to these cases until the Debtors are able to emerge from bankruptcy protection.

Debtors long term liquidity requirements and adequacy of their capital resources are difficult to predict at this time. The Debtors' liquidity, including the ability to meet ongoing operational conditions obligations, will be dependent on, among other things 1) their ability to successfully close and prevail on retention of cash from sale of the LUV project 2) ability to maintain adequate cash on hand; 3) ability to generate cash flow from operations; 4) ability to develop, confirm, and consummate a chapter 11 plan or

other alternative restructuring transaction; and 5) the cost, duration, and outcome of the chapter 11 cases. The Debtors' ability to maintain adequate liquidity depends, in part upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond Debtors' control.

### vi. The Debtors Operate in a Highly Competitive Industry

The Debtors operate in a highly competitive industry and may not be able to maintain or increase current revenues following the emergence from these chapter 11 cases. The Debtors compete with commercial and multifamily real estate developers with both local and in some instances, international resources.. Sales revenue and market share is subject to change for various reasons, including consolidation of the Debtors' competitors through processes such as mergers and acquisitions, which could have the effect of reducing Debtors' revenues in certain markets. The Debtors' competitors may develop technology, services, or advertising media that are equal to or superior to those the Debtors provide or that achieve greater market acceptance and brand recognition than the Debtors achieve. It is also possible that new competitors may emerge and rapidly acquire market share from the Debtors. The Debtors' ability to compete depends in part on the Debtors' ability to achieve a competitive cost structure.

### vii.    The Reorganized Debtors May be Adversely Affected by Potential Litigation

The Debtor may be parties to litigation in the future.  Litigation can be expensive, and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results or their ability to consummate the sales of equity contemplated under the Plan. It is also possible that a party may commence litigation with respect to the treatment of their Claims under

the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become a party to, or the final resolution of such litigation. The effect of any potential litigation can be detrimental to the Reorganized Debtors' finances.

### viii. The Loss of Employees Could Adversely Affect the Debtors' Operations

As a result of these chapter 11 cases, it is possible that the Debtors may experience increased levels of employee attrition, and that the employees may face distraction and uncertainty. A loss of key personal or erosion of employee moral could adversely affect the Debtors' business and results of operations.

### ix. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With a few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of a plan of reorganization 1) would be subject to compromise and/or treatment under the plan of reorganization and/or (2) would be discharged in accordance with the terms of the plan of reorganization. However, there can be no assurance that the aggregate amount of such claims that are not subject to treatment under the Plan or that are not discharged will not be material.

## 6. Summary of the Debtors' Assets and Treatment of Claims and Equity Interests

### a. Summary of Assets

The Debtors filed schedules of all of their assets and liabilities on the Petition Date. Complete copies of the schedules are available from the Clerk of the Court. The primary assets of the bankruptcy estate, their estimated values are reflected in the liquidation

analysis attached as **Exhibit E if requested** for each Entity**.** The values contained in the liquidation analysis are those that the Debtors believe reflect the actual market value of the assets, should they be sold or auctioned in a liquidation scenario. These values are not book values based on purchase price as may be reflected elsewhere.

### b. Summary of the Plan of Reorganization

Debtors shall, as the Reorganized Debtor, continue to exist after the Effective Date as legal entities organized in the State of Texas without any prejudice to any right to alter or terminate such existence under applicable state law.

This Plan provides, with exception of the City of Dallas which is escrowed pending completion of resolution of disputes regarding whether there is a $1 million lien on LUVR in full under on the Effective Date, or under their respective terms. The priority claims to the taxing authorities, if any, will also be paid in full in five years. Unsecured creditors with claims of pre-professional fees not requiring Court approval and trade accounts will be paid 100% of their claims in one single lump sum payment to be made within 180 days of the Effective Date.

### c. Administrative and Priority Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, administrative expense claims and priority tax claims have not been classified and thus are excluded from the classes of claims and equity interests set forth in section (d) below. Administrative claims are the claims allowed under § 503(b) of the Bankruptcy Code for administration of these bankruptcy cases.

All final requests for payment of professional fee claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later

than 90 days after the Effective Date. Retained Professionals shall provide the Debtor with a reasonable and good faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtor before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date and shall provide such estimate no later than five Business Days prior to the anticipated Effective Date. If the Retained Professional does not provide an estimate, Debtor may estimate the amount of unpaid and unbilled fees and expenses. The total estimated amount shall be deposited into the Retained Professional's trust account at least two Business Days prior to the Effective Date. The funds held in the trust account shall be the property of the estates of the Debtor or Reorganized Debtor. When all professional fee claims allowed by the Bankruptcy Court have been paid in full pursuant to one or more final orders of the Bankruptcy Court, any remaining funds held in trust shall be turned over to the Reorganized Debtor without any further notice to or action, order, or approval of the Bankruptcy Court or any other entity.

Holders of Administrative Claims for professional compensation subject to Allowance may include, without limitation, Wiley Law Group PLLC for professional fees in the estimated amount of $50,000; CPA fees of the court appointed certified public accountant(s), if any, and attorney's fees for any required representation of the Debtor's special counsel, if any.

After the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Retained Professional in the ordinary course of business

without any further notice, to or action, order, or approval of, the Bankruptcy Court, should any serves be rendered.

All Statutory Fees that become due and payable prior to the Effective Date shall be paid by the Debtors within thirty (30) days after the Effective Date. After the Effective Date, the Reorganized Debtor shall pay any and all such fees when due and payable and file any reports as applicable. The Reorganized Debtor shall remain obligated to pay the quarterly fees to the United States Trustee until the Chapter 11 cases are converted, dismissed, or a final decree is issued, whichever occurs first.

Except to the extent that a holder of an Allowed Claim of the type described in §507(a)(8) of the Bankruptcy Code has been paid prior to the Effective Date or agrees to a less favorable treatment, in full and final satisfaction compromise, settlement, release, discharge of, and in exchange for, each such Allowed Claim and each Holder of such Allowed Claim shall be treated in accordance with the terms set forth in 1129(a)(9)(C) of the Bankruptcy Code and shall receive annual Cash payments commencing on the first anniversary of the Effective Date to pay the aggregate amount of such Claim within five years of the Petition Date. However, the Debtors and Reorganized Debtor shall have the right to pay any such priority tax claim, or any remaining balance, in full, at the time on or after the Effective Date, without premium or penalty. All priority tax claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due. The total estimated priority tax claims for Debtors are $35,000 for unpaid payroll taxes.

### d. Summary of Treatment of Claims and Equity Interests

#### i. Classification of Claims and Equity Interests

| Class | Type | Status Under Plan | Treatment | Voting Status |
|---|---|---|---|---|
| 1 | Secured Claim-HUD | Unimpaired | Paid 100% on closing of sale or refinancing. Otherwise, pursuant to terms. | Not Applicable |
| 2A-2E | Secured Claims-City of Dallas | Impaired | Paid 100% in escrow on LUV, awaiting dispute resolution; otherwise paid pursuant to terms. | Entitled to Vote on Class 2A Claim. |
| 3 | Secured Claim -Meadows | Unimpaired | Paid 100% | Not Applicable |
| 4. | Secured Claims-Tex. Mezz. | Unimpaired | Paid 100% | Not Applicable |
| 5. | Secured Claim-Federal Home Loan Bank | Unimpaired | Paid 100% | Not Applicable |
| 6. | Bank of America, N.A. | Unimpaired | Paid 100% | Not Applicable |
| 7. | Legacy Bank, N.A. | Unimpaired | Paid 100% | Not Applicable |
| 8. | Frost Bank, N.A. | Unimpaired | Paid 100% | Not Applicable |
| 9. | Mutual of Omaha, N.A. | Unimpaired | Paid 100% | Not Applicable |
| 10. | ST&H Management Co. | Unimpaired | Paid 100% | Not Applicable |
| 11. | Tax Core | Unimpaired | Paid 100% | Not Applicable. |
| 12. | US Small Business Admin. | Unimpaired | Paid 100% | Not Applicable |
| 13. | Unsecured Claims of Professionals and Trade Debt | Impaired | Paid 100% within 180 days. | Entitled to Vote. |
| 14. | Unsecured Claims of Employees | Impaired | Paid 100% within 180 days | Entitled to Vote. (Insiders) |
| 15. | Equity Claims | Unimpaired | Retained Interest | Not Applicable (Insiders) |

ii. **Treatment of Claims**

### Class 1: Secured Claim of HUD on LUV Project and Class 2A
### Secured Claim of City of Dallas on LUV Project

The financing structure of the LUV project is as follows with the debt owed only by LUR to HUD, and all the other Debtors, CWCDC and LUC, having their respective property ownerships in LUV secured by the lien to the City of Dallas on the debt owed by either CWCDC, or LUC:

a. Class 1. Dept. of Housing and Urban Development, FHA 221(d)(4) original loan of $14, 478,800 with a balance now of $12,000,000 secured by a first lien on parcels 1 and 2. Paid in full on the earlier of on or before the Effective Date or the Order Permitting Sale Free and Clear, or Sale Permitting Refinancing and Payment.

b. Class 2A. City of Dallas, Section 108, and New Market Tax Credits. Original loan amount is $11.5 million, composed of $8.293 (rounded) millions of Sec. 108 community development block grants, and $3.00 million plus (rounded) in new market tax credits. Balance remaining now is only the $1,000,000 disputed. This claim will be paid in full into escrow on the earlier of on or before the Effective Date or the Order Permitting Sale Free and Clear or Sale Permitting Refinancing and Payment pending resolution of dispute of Allowed Claim as described below.

c. The transaction structure is complicated, but this after interviews with counsel and others involved in similar transactions, this is the preliminary analysis of the capital deck structure:

    i. First, City forms a special purpose vehicle, DDF Charlie, Inc. ("DDF").

    ii. Since Lancaster Urban Village Commercial, LLC (LUC aka "LUVLLC" in this analysis) actually initially owns both the commercial and

residential real estate, it participates in a lien transaction note and security agreement to secure both the Sec. 108 and I assume the Tax Credit deal, as the "Grantor".

iii. The recitals are then that LUVLLC, as Grantor, executed a note to DDF (the "Original Holder") in the original principal amount of $11.155 million, September 10, 2012. (the "Original Note"). This is also referred to in the Loan Agreement of even date as the "QLICI Note", with the QLICI Lender being DDF.

iv. LUVLLC as Grantor also executed a deed of trust to DDF to secure the Original Note (the "Original Deed of Trust")

v. The Original Note and Deed of Trust were then assigned by DDF as Original Holder to LUV Investment Fund, LLC. ("LUV") ("Initial Assignee").

vi. LUV then assigned the Original Note and Deed of Trust to CWCDC (a/ka the "Company in this analysis) , the Assignor, pursuant to the "Investment Fund Assignment".

vii. Company as "Assignor" executed a note for the section 108 loan of $8.293 in favor of City ("Assignee").

viii. Thus, the only secured creditor that remains from this exercise is the City of Dallas as seen below, AND THUS COMPANY IS THE DEBTOR ON THE CITY OF DALLAS, NOT COMMERCIAL LLC, SECURED BY THE PROPERTY.

ix. This is recited as part consideration for a "Leveraged Loan Note" from Company as Assignor in favor of City as Assignee, where Company as Assignor assigned the Leveraged Loan Note in the amount of $8.492 million described as "City's Original Note", pursuant to a "Collateral Assignment".

x. Pursuant to an "Investment Fund Assignment", the Original Note and Original Deed of Trust were assigned by LUV, Initial Assignee to Company, Assignor, in complete satisfaction of the Leveraged Lien Note so that Company, Assignor is making a collateral assignment to City, Assignee.

xi. The result is the $1 million dollar note made by Company to City, is fully secured, subject to the limitations of the loan agreement that restrict City to residential proceeds, representing 57% in value of the project. This note is dated September 12, 2012, but although secured by the project, creates an obligation only out of the 50% Sale/Refinancing Net Proceeds that arises after all the loans have been repaid to: (i) City of Dallas; (ii) the Section 108 loan; (iii)Catalyst Urban Lancaster Development; and (iv) loan in the amount of $2,500,000 dated the same date of the $1 million note, or September 12,2012. The note does not bear interest except on default. Whether any amount is actually due is thus subject to completion of this calculation of net proceeds available from any sale of the project, and satisfaction of the disputed claims as to whether the extension of the deed of trust within applicable statutes of limitation were valid. Any allowed claim of the Class 2A claim of the City of Dallas will be paid

upon resolution of the dispute as to allowance based on amount if any owed under the calculation, and whether there is a valid claim based on the extension of the lien and deed of trust within the statute of limitations.

**xii.** The original $8.492 million has been completely satisfied, according to Company management, by the assignment of TIF incremental tax process, leaving just the $1 million balance under the original note.

**xiii.** There remain executory contracts to be listed in Schedule G that arose from the sale which include the memorandum of operating and maintenance agreement for non-standard public improvements, recorded March 6, 2019. There is also a Community Benefits Agreement dated September 10, 2012 where Company as "Sponsor" and "NMTC Beneficiary" agreed to keep the property under low- and moderate-income usage under deed restrictions. There is also a use restriction that was of even date with the loan and recorded of even date for affordable rent levels. His use restriction has the later of 15 years from date, 2027 or payment date of the City of Dallas loan.

**xiv.** The HUD secured claim of approximately $12 million will be paid by an approved assumption of the T.D. Jakes Foundation pursuant to a final Order approving sale free and clear of liens, claims and interest, under the terms of the contract annexed hereto as Ex. F, or other qualified buyer if a higher bid is allowed and received, subject to break-up fee wit T.D. Jakes Foundation. If no sale, then by an Order approving refinancing of the LUV Project paid on the Effective Date.

**Other Secured Claims of City of Dallas (All Unimpaired Claims Paid on the Effective Date in full or pursuant to their respective terms).**

**Class 2B-Secured Claim of City of Dallas-Serenity**

**a.** Description. This is a completed project featuring a gated, 45-unit apartment complex as part of a long-term commitment to transition families out of shelters into permanent housing. It sits on approximately 7.1 acres of land located directly across the street from Lancaster-Kiest shopping plaza on Lancaster Rd.

**b.** The secured creditors and parties involved in this project are Fed. Home Loan Bank, Bank of America, City Wide GP as Borrower, and Serenity Place, LP as operating company where City Wide owns the GP, and therefore is also generally liable for the debt of the limited partnership.

c. The balance on the financial statements for the City of Dallas as of 12/31 is $81,757.39. CWCDC BELIEVES THAT THIS IS WRONG, AND THERE IS SUBSTANTIAL BUT FORGIVEABLE AMOUNT OWED TO CITY OF DALLAS ON THIS PROJECT PRESUMBABLY SECURED BY NOTE AND DEED OF TRUST OR CONDITONAL GRANT AND DEED OF TRUST, AND THE ACCOUNTANT DISREGARDS THE FORGIVEABLE AMOUNT BASED ON GENERALLY ACCEPTABLE ACCOUNTING PRINCIPLES THAT ALLOW FOR SUCH REPORTING.

### Class 2C-City of Dallas Blossom Gardens

a. Description. This is a completed project featuring a 12-unit, garden styled apartment complex dedicated to providing permanent housing and supportive services to formerly homeless seniors. Company provides case management services and receives Section 8 project-based vouchers to assist.

b. The entities involved in this project include City of Dallas, Meadows Foundation, and Texas Mezzanine Fund. However, there are no defaults and there will be conditional grants with executory contracts to be assumed, with senior creditors paid pursuant to their terms.

c. Meadows and Texas Mezz. Funds are separately classified as Classes 3 and 4, respectively.

d. The terms of these respective loans will be paid without modification.

### Class 2-D -City of Dallas-Lancaster Kiest Crossing

a. Description. This is a substantially completed project featuring a 2 story, 9,686 sq. ft. office complex located at 3111-3115 S. Lancaster Rd. The complex is 90% leased with signed contracts with T-Mobile as the anchor tenant.

b. Secured creditors and entities involved in this project include CWCDC as Debtor, Legacy Bank as the prime secured lender, Class 6, City of Dallas, and possibly Tex. Mezzanine Fund under Class 4 .

c. There again are no defaults in financial obligations to any secured creditors. Rather there is a dispute regarding phase IV of the project, and the City is threatening BY ITS 9/18/2020 LETTER performance defaults and refusing to provide extensions of performance, to counter-act may require adversary proceedings that threaten the City with hindrance and interference defenses and/or 42 USC 1983 discrimination actions to any motion to lift stay that are likely to follow.

d. There is also a threatened termination of the Reentry Service Program that is related to this project.

e. City of Dallas has a deed of trust to secure performance of a conditional grant agreement dated 4/29/2016 and of even date thereof in the original amount of $825,000 in the event of default in the performance of conditions restricting use of the property, and any other sums advanced by loan or grant. There does not appear to be a balance owed because of no default and no additional loans, and the forgivable terms of the loan, but this will be confirmed.

f. The City of Dallas in its Dec 18, 2020 letter recites SOME of the above, provides a history back to 2012 and refers to instruments that are not in the deed records for City Wide, particularly, a loan in the amount of $1,576,534 to allow purchase of the former Rudy's Chicken site at 3111 and 3115 S. Lancaster Rd. Since this loan does not appear on the Company's financials, we must assume another entity to be discovered OR THE ACCOUNTANTS TREAT THE "LOAN" AS A CONDITIONAL GRANT NOT GIVING RISE TO ANY OBLIGATION TO BE BOOKED IN THE ABSENCE OF DEFAULT., AND WHICH IS SECURED UNDER THE DEEDS OF TRUST UMBRELLA CLAUSES FOR "ANY OTHER ADVANCES".

g. The City of Dallas 18, 2020 letter also threatens foreclosure on alleged failure of the Company to achieve performance goals in Phase 1 and 4, which they contend is a default under Article 5 (sic" V"?) of the loan agreement, and default will be sought under Article 6 (sic "VI")?) of the loan agreement.

h. Legacy Bank under Class 6 has a deed of trust recorded 4/29/2016 to secure a promissory note in the original principal amount of $860,000. The balance on that note as of December 31, 2020 was $814.193.49. The Deed of Trust secures this note for the property described as 31,571 sq. ft. or 0.725 acres of land.

### Class 2-E. City of Dallas. Lisbon Village

a. Description This is a PROPOSED subdivision consisting of 20 single family homes located on approximately 3.5 acres of land located at 1722 &1728 Ann Arbor, blended with 1900 Mentor Ave. and 4418 S. Denley Dr. adjacent to the Lisbon Cemetery and Lancaster Urban Village Project. The project contemplated two phases, with phase 1 consisting of acquisition, demolition, excavation, utilities, sewer, drainage, water, lights, streets, and sidewalls. Phase II will be vertical construction of twenty (20) townhomes. The construction budget was estimated at $5.050 million.

b. Parties. The Company does not appear to be represented by an affiliate. Development and Acquisition financing was contemplated by City of Dallas. Construction Financing was contemplated by Mutual of Omaha, Legacy Bank, and Frost Bank. No loan documentation appears in the property record.

c. Debt: The city advised in the 9/18/2020 letter that it had approved a conditional grant of $950,000 but same has yet to be funded. The city also advised that it was backing away from the conditional grant. It is therefore unclear whether any claim exists on behalf of the City, as opposed as a Claim against the City by CWDC which may be set-off against other claims of City.

### Class 2E- City of Dallas- Lancaster Opal

a. This is a PROPOSED project for a mixed use, mixed income development named Lancaster Opal. The site is approximately 2.38 acres that is generally located on the southeast side of 3700 block of S. Lancaster Rd. between Marfa Ave., Opal Ave., and Hudspeth Ave, adjacent to the CWCDC Lancaster Office Building. The site has frontage on Lancaster Rd. and the DART rail system, in the TOD TIF District. The project will involve 63-unit apartment complex, above the ground floor commercial, combined with ten single family townhomes. The project is in three phases, with phase 1 infrastructure improvements; phase 2 vertical construction of commercial and apartments; and phase 3 townhomes.

b. Parties. The company is not presently represented by an affiliate. Only the City of Dallas is an official lender at this time. Frost Bank in Class in 8 also has a secured lien on some properties in this project.

c. Debt. Based on the 9/18/20 letter from the City of Dallas, same advises that on September 10, 2008, the City granted the Company a $500,000 interest free loan for the acquisition of 14 properties (improved and unimproved, ultimately increased to $1.331, 326 , which ae purported to also changed the agreement from an interest free loan to a conditional grant, with an agreed completion date of September 12, 2018. An extension was sought but declined in the 9/28/20 letter, and the City states that the Company is in default under Articles 4 and 5. This gives rise to a potential motion to lift stay to permit foreclosure under any liens granted under notes/conditional grants, which can only be countered by a lawsuit proving hindrance and prevention, or alternatively, discrimination on the basis of race under 42 USC 1983. The City has not provided to date a formal notice of default and acceleration under loan/conditional grants.

d. Other Debt. Based on review of the deed records, other Debt appears to be

in favor of Mutual of Omaha (Class 9) with respect to 3710 Opal Ave. Also, Texas Mezz. Fund (Class 4) in connection with 3710 Opal. No amount of debt is specified in the deeds of trust.

e. Class 3-Secured Claim of Meadows Foundation-Blossom Gardens. See above. Unimpaired.

f. Class 4 Secured Claims of Texas Mezzanine Fund. See above. Unimpaired. Approximately $126,500.

g. Class 5 Secured Claim of Federal Home Loan Bank. See above. Unimpaired.

h. Class 6 Secured Claim of Legacy Bank. See above. Unimpaired. Approximately $865,000.00.

i. Class 7 Secured Claim of Bank of America, N.A. See above. Unimpaired.

j. Class 8-Secured Claim of Frost Bank, N.A. See above. Unimpaired. Approximately $58,500.00.

k. Class 9-Secured Claim of Mutual of Omaha. See above. Unimpaired.

l. Class 10-Secured Claim of ST&H Management Company for tax loans. Paid 100%. Unimpaired. Approximately $90,000.

m. Class 11-Secured Claim of Tax Core for tax loans. Paid 100%. Unimpaired. Approximately $147,000.

n. Class 12-Secured Claim of United States Small Business Administration for Economic Assistance Disaster Loan. Unimpaired. Approximately $150,000

**Class 13: Unsecured Creditors of Professionals and Trade Debt**

This class consists of all known non-priority unsecured claims of professionals rendering professional accounting, legal, or other services to the Debtor prior to the filing, whether scheduled or based on proofs of claim on file and some trade claims. Allowed Claims of creditors in Class 10 shall be paid 100% of their Allowed Claims. Creditors will receive a single lump sum payment of 100% of their Allowed Claim paid within 180 days of the Effective Date. Debtors believe the total Allowed Claims in

Class 13 will be approximately $80,000 on the Effective Date.

Class 13 is Impaired under the Plan and therefore entitled to vote to accept or reject the Plan, although such consent is not required.

### Class 14: Unpaid Salaries and Benefits

This class consists of all known non-priority unsecured claims of employees rendering employment services to the Debtor prior to the filing, whether scheduled or based on proofs of claim on file. Allowed Claims of creditors in Class 14 shall be paid 100% of their Allowed Claims. Creditors will receive a single lump sum payment of 100% of their Allowed Claim paid within 180 days of the Effective Date. Debtors believe the total Allowed Claims in Class 13 will be approximately $595,000 on the Effective Date.

Class 14 is Impaired under the Plan and therefore entitled to vote to accept or reject the Plan.

### Executory Contracts and Leases

Except for the assumed contracts and leases scheduled, which include all current leases, commercial and residential for all projects, all executory leases, and contracts, if any others, are rejected as of the Effective Date. There is no amount to cure. Proofs of claim for damages arising from the rejection of an executory lease or contract must be filed no later than 30 days after the Effective Date. Claims filed after that date will not be paid.

If you are a contracting party on an assumed contract and disagree with the cure amounts offered, you must file an objection prior to the objection deadline of sixty (60) days following entry of the Confirmation Order. If you do not file an objection prior to the objection deadline, the Court may confirm the plan and you will be bound by the

terms of the confirmed plan as to the cure amount.

## 8. Claims Objections

Claims objections must be filed not later than 60 days after entry of the order confirming the Plan. The Court, on motion by a party in interest, may extend the deadline. Any such motion must be filed not later than 60 days after entry of the order confirming the plan.

Except for as otherwise provided herein or as agreed to by the Reorganized Debtor, all Proofs of Claim filed after the applicable claims bar date (regular claims and government) shall be deemed disallowed in full and expunged as of the Effective Date, forever barred, estopped, and enjoined from assertion.

On or after the Effective Date, except as provided in the Plan of Confirmation Order, a Proof of Claim may not be amended without prior authorization of the Bankruptcy Court and the Reorganized Debtor. Any unauthorized amended Proof of Claim shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court;

provided that the foregoing shall not apply to Administrative Claims.

## 9. Confirmation Procedure

### a. Hearing

A hearing has been scheduled for [INSERT DATE AND TIME . (Central Time), before the Honorable Michelle V. Larson, United States Bankruptcy Judge, 1100 Commerce Street, 14th Floor, and computer video  to consider confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code. The Confirmation Hearing will be held electronically, parties must follow the instructions set forth on Judge Larson's

web-page located at https://us-courts.webex.com/meet/larson and you may participate by telephone by **1-650-479-3207**. You may participate with witness testimony and live appearance by WebEx Website and access code is **1650-135-6015.** The hearing may be adjourned from time to time by the Bankruptcy Court.

### b. Procedure for Objecting

Any objection to confirmation of this Plan must: a) be in writing, b) conform to the applicable Bankruptcy Rules, c) be filed with the Bankruptcy Court and served so as to be actually received on or before 12:00 p.m. on [INSERT OBJECTION DEADLINE] ("Confirmation Objection Deadline"), by (i) counsel for the Debtor, Kevin S. Wiley, Sr., Wiley Law Group, PLLC, 325 N. St. Paul, Ste., 2250, Dallas, Texas 75201 and ii) the United States Trustee, 1100 Commerce Street, Dallas, Texas 75241. Same is also the deadline for timely filing with the bankruptcy clerk.

Unless an objection is timely filed and served by the Confirmation Objection Deadline, such objection may not be considered by the Bankruptcy Court at the Confirmation Hearing.

### c. Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all applicable requirements of section 1129 of the Bankruptcy Code. Among the requirements for confirmation is that the Plan be: a) accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, that the Plan distribute the equivalent of at least three years of disposable income, "does not discriminate unfairly" against and is "fair and equitable"; and b) feasible. The Bankruptcy Court must also find that a) the Plan has classified Claims and Equity Interests in a permissible manner;

b) the Plan complies with the other technical requirements of Chapter 11 of the Bankruptcy Code; and c) the Plan has been proposed in good faith. The Debtor believe that the Plan complies, or will comply, with all such requirements.

### d. Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code requires the Plan to place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such Class. The Plan creates separate Classes to deal respectively with the various claims and interests. The Debtor believes that the Plan's classifications place substantially similar Claims and Equity Interests in the same Class and this meet the requirements of section 1122 of the Bankruptcy Code.

### e. Impaired Claims or Equity Interests

Section 1124 of the Bankruptcy Code provides that a Class of Claims or Equity Interests may be Impaired if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Equity Interests. Holders of Claims or Equity Interests that are Impaired and not insiders are entitled to vote on the Plan. Holders of Claims that are not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan. Consent of at least one class of impaired, non-insider class if required if the plan is not consented to by all impaired voting classes.

### f. Eligibility to Vote on the Plan

Unless otherwise ordered by the Bankruptcy Court, only Holders of Claims in Classes 2A, 13 and 14  may vote on the Plan. In order to vote on the Plan, you must therefore hold a Claim in Classes 2A, 13, and 14 Debtor will only solicit votes from Holders of Claims that are entitled to vote.

66

### g. Voting Deadline

The deadline to submit the voting ballot is [INSERT DEADLINE DATE HERE]          .

In order for the ballots to count, it must be complete and delivered timely to Kevin S. Wiley, Sr., Wiley Law Group, PLLC, 325 N. St. Paul, Ste., 2250, Dallas, Texas 7520 and filed with the bankruptcy clerk. Any legible ballot that is timely received from a party entitled to vote, that contains sufficient information to permit the identification of the party casting the ballot, and that is cast as an acceptance or rejection of the Plan will be counted and will be deemed to be cast as an acceptance or rejection. The form of Ballot is attached as **Exhibit G**.

### h. Acceptance of the Plan

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan. Also, at least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Plan. The Debtor urges that you vote to accept the Plan, since that greatly assists in the confirmation procedure on meeting the other requirements.

### 10. Provisions Governing Distributions

### a. Method of Payment

Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank or electronic wire.

### b. Distribution Agent

Here, the Reorganized Debtor will act as the Distribution Agent.  The Distribution

Agent shall be empowered to a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; b) make all distributions contemplated under the Plan; c) employ professionals to represent it with respect to its responsibilities; and d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan. Reasonable fees and expenses incurred by the Distribution Agent after the Effective Date shall be paid by the Reorganized Debtor. The Distribution Agent shall not be required to give bond or surety or otherwise provide security for the performance of its duties unless ordered by the Bankruptcy Court.

### c. Distributions

Distributions shall be made to the Holders of Allowed Claims after the Effective Date a) to the address of each such Holder as set forth in the Debtors' Books and Records (or if the Debtors have been notified in writing, on or before the date that is 10 Business Days before the Effective Date, of a change of address, to the changed address) or in the Claims registers as of the date of the Confirmation Hearing or (b) on any counsel that has provided notice of representation or appeared in the Chapter 11 Cases on the Holders Behalf; provided that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in, as applicable, any Proof of Claim filed. If no Proof of Claim has been filed, then the address set forth in the Schedules. Notwithstanding anything to the contrary in the Plan, the Debtors, the Reorganized Debtor, and Distribution Agent as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

### e. Rule for Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Reorganized Debtor and the Holder of a Disputed Claim, or as set forth in a final order, no partial payments and partial distributions should be made with respect to a Disputed Claim until the Disputed Claim has become an Allowed Claim or has otherwise been resolved by settlement or final order.

### f. Undeliverable Distributions and Unclaimed Property

In the event that either (a) a distribution to any Holder is returned as undelivered or (b) the Holder of an Allowed Claim or Allowed Interest does not respond to a request for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the it has been determined that the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time the distribution shall be made without interest or other accruals; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is six months after the later of (a) the Effective Date and (v) the date of the distribution. After such date, all unclaimed property of interests in property shall revert to the Reorganized Debtor automatically and without a need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

## 11. Effect of Confirmation of the Plan

Except as provided in this Plan, the occurrence of the Effective Date of this Plan shall,

and does hereby, act to discharge and release the Claims of all creditors of all interests against the Debtor and the Reorganized Debtor and shall be deemed to constitute a full and complete settlement with such creditors. The Plan constitutes complete satisfaction, discharge, and release of all claims, causes of action of any nature whatsoever, including any interest accrued on claims of from and after the Petition Date, whether known or unknown, against, liabilities, liens on, obligations of, and rights against the Debtor or any of their assets, regardless of whether any of their assets shall have been distributed or retained pursuant to the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the occurrence of the Effective Date.

Confirmation of the Plan, however, shall not disturb the perfected liens on any class of secured creditors as provided for in this Plan. With respect to the classes of secured creditors holding a secured claim, such creditors shall retain their lien(s) securing such claims until such a time that the secured claim is satisfied.

## 12. United States Trustee Fees

The Debtors will be responsible for timely payment of United States Trustee quarterly fees incurred pursuant to 28 U.S.C § 1930(a)(6). Any fees due as of the date of confirmation will be paid on the Effective Date. After confirmation, the Reorganized Debtor will continue to file timely financial reports.

## 13. Miscellaneous Provisions

### a. Binding Effect

The Plan shall be binding upon and inure to the benefit of the Reorganized Debtor, the Holders of Claims and Holders of Equity Interests, and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under

the Plan and whether or not such holder has accepted the Plan.

### b. Headings

Headings are used in the Plan for convenience and reference only and shall not constitute a part of the Plan.

### c. Termination of Injunctions or Stays

Unless otherwise provided herein or in another order from the Bankruptcy Court, all injunctions or stays provided for in these Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date shall terminate on the Effective Date, at which time the injunctions and stays set forth in this Plan shall take effect. Provided, however, the Confirmation of the First Amended Plan shall constitute an injunction against any action by any party that seeks to interfere with the First Amended Plan. Amendment or Modification of the Plan

Alterations, amendments, or modifications of the First Amended Plan may be proposed in writing by the Debtors, at any time before the Confirmation Date, provided that the First Amended Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors have complied with sections 1125 of the Bankruptcy Code. A holder of a Claim that has accepted the First Amended Plan shall be deemed to have accepted the First Amended Plan, as altered, further amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such holder. Prior to the Effective Date, the Debtors may make appropriate technical non-material modifications to the First Amended Plan without further order or approval of the Bankruptcy Court, provided that such technical modifications do not adversely affect the

treatment of holders of Claims or Equity Interests.

### d. Severability

In the event the Bankruptcy Court determines, before the Confirmation Date, that any provisions in this First Amended Plan are invalid, void, or unenforceable, such provision shall be invalid, void, or unenforceable with respect to the Holder or Holders of such Claims or Equity Interests as to which the provision is determined to be invalid, void, or unenforceable. The invalidity, voidability or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the First Amended Plan and shall not require re- solicitation of any acceptance or rejection of the First Amended Plan unless otherwise ordered by the Bankruptcy Court.

### e. Revocation or Withdrawal of the Combined Plan and Disclosure Statement

The Debtor reserves the right to revoke or withdraw the First Amended Plan before the Confirmation Date. If the Debtor revokes or withdraws the First Amended Plan, then the First Amended Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claim by or against the Debtor and the Estate.

### f. Exhibits and Schedules.

All exhibits and schedules to the First Amended Disclosure are incorporated into and are a part of the First Amended Plan as if set forth in full therein.

### g. No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the First Amended Plan shall be deemed as an admission by any Entity with respect to any matter

set forth herein.

**h. Successors and Assigns.**

The rights, benefits and obligations of any Person or Entity named or referred to in the First Amended Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

**i. Implementation**

The Debtor and Reorganized Debtor, as applicable, shall take all steps and execute all documents, necessary to effectuate the provisions contained in this First Amended Plan.

**j. Inconsistency**

In the event of any inconsistency among the First Amended Plan and any other instrument or document created or executed pursuant to the First Amended Plan, the provisions of the First Amended Plan shall govern.

Dated: May 25, 2021          Respectfully submitted,

         **WILEY LAW GROUP, PLLC**

         /s/ Kevin S. Wiley, Sr.
         Kevin S. Wiley, Sr.
         State Bar No. 21470700
         325 N. St. Paul Street, Suite 2250
         Dallas, Texas 75201
         Telephone: 972-913-2683
         Telecopier: 972-449-5717
         Email: kwiley@wileylawgroup.com
         ***Proposed Counsel for Debtors***